UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARY JANE DICKSON,

     Plaintiff,

v.

ADAMS OUTDOOR ADVERTISING
LIMITED PARTNERSHIP OF
MINNESOTA,

     Defendant.

Case No. 17-cv-12533
Honorable Laurie J. Michelson
Magistrate Judge Anthony P. Patti

---

### OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [55]

---

Mary Jane Dickson used to work as a general sales manager for Adams Outdoor Advertising. Dickson and Adams Outdoor disagree as to the reason her employment ended. Dickson says that Adams Outdoor was a "boys club" and that her gender played a role in her termination. She also says that when she complained of gender discrimination, Adams Outdoor retaliated. Adams Outdoor, by contrast, says that the office where Dickson worked had too many managers and that Dickson had performance-related problems. The Equal Employment Opportunity Commission was unable to resolve these differences in opinion.

So Dickson has sued Adams Outdoor, asserting that the company violated Title VII of the Civil Rights Act of 1964 (as amended) and Michigan's Elliott-Larsen Civil Rights Act. The parties apparently learned everything they could about what happened (deposing no less than 16 people). And now Adams Outdoor asserts that no reasonable jury considering the collected evidence could find in Dickson's favor. So Adams Outdoor asks this Court to grant it summary judgment. (ECF No. 55.)

For the reasons set out below, the Court will dismiss Dickson's retaliation claims, but her discrimination claims will proceed to trial.

## I.

While the Court acknowledges that the Adams Outdoor employees accused of wrongdoing have a different take on what occurred, because Adams Outdoor seeks summary judgment, the following factual account views the evidence in the light most favorable to Dickson. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## A.

A bit of background about the parties provides context for this case.

Adams Outdoor Advertising Limited Partnership of Minnesota sells or leases outdoor advertising space, e.g., billboard space. (*See* ECF No. 55-2, PageID.3634–3635; ECF No. 55-9, PageID.4641.) During Dickson's employment, Adams Outdoor employed around 400 people in various-sized offices throughout the eastern half of the country. (ECF No. 55-2, PageID.3498.) In Michigan, Adams Outdoor had three markets: Kalamazoo, Lansing, and Ann Arbor. (ECF No. 55-7, PageID.4373; ECF No. 55-16, PageID.5230; ECF No. 55-2, PageID.3643.) Its CEO and president was (and is) Kevin Gleason. (ECF No. 55-2, PageID.3478.) Adams Outdoor was structured such that the general manager for a market (e.g., Ann Arbor) would report either to a regional manager or to Gleason. (ECF No. 55-2, PageID.3496–3498.) During Dickson's employment, the regional manager for the region that included the Ann Arbor market was Christopher Eigenberger. (ECF No. 55-2, PageID.3501.)

Around January 2015—shortly before Dickson was hired by Adams Outdoor—Adams Outdoor either acquired or partnered with a similar company, Fairway Outdoor. (*See* ECF No. 55-

2, PageID.3490, 3533, 3563.) Gleason also served as the president and CEO of Fairway Outdoor. (ECF No. 55-2, PageID.3479.)

Prior to joining Adams Outdoor, Mary Jane Dickson had considerable experience in selling print, television, and radio advertising. From 2004 to 2009, Dickson sold advertising for Comcast; she was the sales manager for Comcast's Flint, Michigan, office before being promoted to general sales manager for Southeast Michigan. (ECF No. 45-3, PageID.2872.) In 2009, Dickson became the vice president and general manager for Cumulus Media in Flint. (ECF No. 45-3, PageID.2872–73.) And from 2011 to 2013, Dickson served as the general sales manager and acting general manager for Viamedia, a cable company. (ECF No. 45-3, PageID.2873.)

With that background, the Court turns to the events giving rise to this case.

## B.

At the start of 2015, the general manager of Adams Outdoor's Ann Arbor office, Todd McWilliams, needed help with his general-manager duties. Because McWilliams was handling some national and regional-manager work, he had to be away from the Ann Arbor office two or three days a week. (ECF No. 55-4, PageID.3975, 3979, 4015; ECF No. 55-7, PageID.4237.) So in March 2015, McWilliams hired Dickson as a "general sales manager." (ECF No. 55-7, PageID.4231–4233.) As general sales manager for Ann Arbor, Dickson acted as the office's general manager when McWilliams was away. (ECF No. 55-7, PageID.4232–4233; ECF No. 55-4, PageID.3990, 4016.)

Although the general sales manager position was not unique to Ann Arbor, the vast majority of Adams Outdoor and Fairway Outdoor offices did not have that position. (ECF No. 57-4, PageID.5770–5773; *see also* ECF No. 55-4, PageID.3990 (indicating that GSM position was new with Fairway partnership).) Instead, most Adams Outdoor and Fairway Outdoor offices had

a general manager, a sales manager who reported to the general manager, and account executives (salespeople) who reported to the sales manager. (*See* ECF No. 57-4, PageID.5770–5773.) Indeed, Adams Outdoor's job description for a "general sales manager" suggests that the position was for "large markets with multiple Sales Managers or regions." (*See* ECF No. 55-7, PageID.4247.) Ann Arbor was not considered a large market and did not have multiple sales managers. (*See* ECF No. 55-11, PageID.4830, 4834; ECF No. 55-2, PageID.3579–3580; ECF No. 55-7, PageID.4270.) Neither Kalamazoo nor Lansing, which were markets similar to Ann Arbor (ECF No. 55-11, PageID.4830, 4835), had a general sales manager (ECF No. 57-4, PageID.5770).

As general sales manager, Dickson proposed, and apparently implemented, a change to how account executives sold inventory outside of their market. There were instances where, for example, an account executive in the Lansing office would sell billboard space in the Ann Arbor market without knowing the Ann Arbor rates. As a result, Ann Arbor's billboard inventory might be sold at too low of a rate. Dickson proposed that before an account executive could sell billboard space outside his or her market, the sales managers of all the affected markets would have to approve the rates. (ECF No. 55-7, PageID.4252–4254.)

Dickson recalls that some account executives in Lansing were not happy with the new procedure. (ECF No. 55-7, PageID.4278–4279.) Although perhaps not because of the change in procedure, the Lansing sales manager and some of the Lansing account executives did not want to work with Dickson. (ECF No. 55-15, PageID.5161; *see also* ECF No. 55-3, PageID.3843, 3902; ECF No. 55-4, PageID.4089.)

Dickson was also tasked with coming up with a plan for a new office in Southfield, Michigan. (ECF No. 55-7, PageID.4329–4330.) Dickson recalls being told that if the plan was not successful, "they" would fire her. (ECF No. 55-7, PageID.4330.) Dickson believes that "they"

consisted of Brian Grant, Adams Outdoor's vice president of human resources, and Eigenberger, the regional manager. (ECF No. 55-7, PageID.4330; ECF No. 57-4, PageID.5769.) Toward the end of Dickson's tenure at Adams Outdoor (i.e., the end of 2015 or early 2016), an office did open in Southfield. (ECF No. 55-8, PageID.4540; ECF No. 55-11, PageID.4849.) The two account executives in Southfield, Shana Dellas and Elizabeth Topping, reported directly to Dickson. (ECF No. 57-14, PageID.5899.)

In June or July 2015, Dickson hired Michael Musto as the sales manager in the Ann Arbor office. (ECF No. 55-8, PageID.4496; ECF No. 55-7, PageID.4275.) Dickson had worked with Musto at Viamedia and considered Musto a friend. (ECF No. 55-7, PageID.4272.)

In September 2015, McWilliams left the Ann Arbor office completely to become the general manager for Adams Outdoor's office in Madison, Wisconsin. (ECF No. 55-4, PageID.3974, 3985.) Thus, the Ann Arbor general manager position became vacant. Later that month, Eigenberger (regional manager) and Grant (VP of HR) made Dickson the interim general manager of the Ann Arbor office. (ECF No. 55, PageID.4125; ECF No. 55-7, PageID.4304; *see also* ECF No. 55-3, PageID.3756, 3822, 3928.)

### C.

At this point, it is useful to pause the chronological narrative and provide some information about Eigenberger's and Grant's reputations as they relate to this case.

According to several Adams Outdoor employees, Eigenberger was at times rude or condescending—to both men and women. (ECF No. 55-8, PageID.4541 (Musto); ECF No. 57-12, PageID.5855 (Topping); ECF No. 55-10, PageID.4729, 4746 (Buck); ECF No. 55-11, PageID.4859–4860 (Cannon).)

But according to other Adams Outdoor employees, Eigenberger treated women worse than men. Dickson recalls that Eigenberger would talk over her and cut her off when she was speaking. (ECF No. 55-7, PageID.4332.) Dickson never saw Eigenberger do the same to McWilliams, Musto, or Brian Buck (male employees in the Ann Arbor office). (ECF No. 55-7, PageID.4332.) Dickson also recalls a meeting where she "was the senior person in the room" and Eigenberger asked her "to get him a cup of coffee." (ECF No. 55-7, PageID.4315.) Musto recalls that Eigenberger was also rude to him and also asked him to get coffee. (ECF No. 55-8, PageID.4540, 4590.) But Dellas (an account executive in Southfield) "would be surprised" if Eigenberger "ask[ed] Mike Musto to get him coffee if [Dickson] was in the room, or any other woman were in the room." (ECF No. 55-16, PageID.5259.) Dellas also remembers a meeting where Eigenberger was "really kind of nasty" to Dickson and thought to herself that "you've kind of got to develop thick skin if you work with a bunch of men and this is sort of the playing field." (ECF No. 55-16, PageID.5244.) Dellas and Kathie Sjoberg (an account executive in Ann Arbor) both declare that "[t]he difference between how [Eigenberger] treated [Dickson] versus how he treated men like Mike Musto was very obvious." (ECF No. 57-8, PageID.5779; ECF No. 57-10, PageID.5836.) Sjoberg never observed Eigenberger be rude to men in the office (ECF No. 55-9, PageID.4671) and says that Eigenberger would negatively single out women in meetings much more often than men. (ECF No. 55-9, PageID.4677.)

Several Adams Outdoor employees also recall Eigenberger acting inappropriately with female employees he found attractive. Dellas recalls that Eigenberger "would leer" at a "very attractive" woman named Starr Brendengen. (ECF No. 57-8, PageID.5779.) "She was so uncomfortable she would take time off when she knew he was in the office," Dellas says. (*Id.*) Sjoberg holds the same opinion: "Brendengen . . . was very uncomfortable with Chris Eigenberger,

who she described as creepy.'" (ECF No. 57-10, PageID.5836.) One employee also recalled a rumor that Eigenberger "spent more time with what you would consider [a] prettier employee" in Wisconsin. (ECF No. 45-8, PageID.2905.) And in 2017 (the year after Dickson left Adams Outdoor), Eigenberger forced a female employee to give him a kiss. (ECF No. 55-22, PageID.5414.)

At least two Adams Outdoor employees, Dickson and Sjoberg, thought that their Vice President of HR, Grant, also acted inappropriately toward women. Sjoberg recalls that Grant was "very touchy, feely with the young women in the office, sitting on their desks in cubicles, hugging, cheek kissing and inviting to drinks." (ECF No. 57-10, PageID.5836.) Sjoberg specifically remembers Grant acting this way toward Elizabeth Topping, an account executive in Southfield. (ECF No. 55-9, PageID.4653.) In Sjoberg's opinion, Grant was "more of an HR issue than a HR person." (ECF No. 55-9, PageID.4653.) And as will be detailed below, Dickson also recalls Grant dancing inappropriately with a female employee during a managers' meeting in Mexico.

### D.

In October 2015, Eigenberger remarked about the age of two of Dickson's recently hired account executives: Kathy Sjoberg, who was 60 years old, and Janet Jablonski. (*See* ECF No. 55-7, PageID.4295–4296.) Dickson recalls Eigenberger saying to her: "This is going to sound really bad, but I was surprised to see how old Kathy is. . . . Am I going to see the same thing [in Janet] as I see in Kathy?" (ECF No. 55-7, PageID.4295–4296.)

Dickson reported Eigenberger's remarks to Brian Buck. (ECF No. 55-7, PageID.4310.) Although Buck was the controller for the Ann Arbor office (ECF No. 57-14, PageID.5899), he also served as the onsite human-resources person (*see* ECF No. 55-8, PageID.4517–4518; ECF No. 55-10, PageID.4718). If there was a human-resources issue, Buck was supposed to report it to

"management," which presumably included Grant. (*See* ECF No. 55-24, PageID.5474, 5547, 5548; ECF No. 55-10, PageID.4719.)

**E.**

During the fall of 2015, Eigenberger was busy trying to permanently fill the Ann Arbor general manager position vacated by McWilliams.

It appears that Eigenberger's process for hiring McWilliams' replacement was rather informal. Rather than posting the vacancy, collecting applications, and conducting formal interviews, Eigenberger personally recruited people that he thought would be good for the job and then discussed the position with the candidate. (ECF No. 55-3, PageID.3859.)

Musto (the sales manager Dickson had hired) was among the people that Eigenberger recruited. It appears that Eigenberger liked Musto from the get-go: within two weeks of his hire as sales manager, Eigenberger approached Musto about applying for a general manger position in Chattanooga, Tennessee. (ECF No. 55-8, PageID.4522.) In the November 2015 timeframe, Eigenberger talked with Musto about the Ann Arbor general manager position for about 35 minutes. (ECF No. 55-3, PageID.3869–3870.) Musto recalls that Eigenberger invited him to have dinner with the sales manager and the general manager of the Lansing office. (ECF No. 55-8, PageID.4570.) At some point, Musto told Eigenberger that "MJ was your guy" for the Ann Arbor general manager position, referring to Mary Jane Dickson. (ECF No. 55-8, PageID.4598.)

Eigenberger also reached out to Danielle Haaksma at another company about the general manager position in Ann Arbor. (ECF No. 55-3, PageID.3859) Eigenberger recalls Haaksma being his "number one choice" for the job, but she was unwilling to relocate for it. (ECF No. 55-3, PageID.3859)

8

The record is not clear as to whether Eigenberger interviewed Dickson for the general manager position. Dickson believes that she was not interviewed for the job. (ECF No. 45-3, PageID.2869; *see also* ECF No. 55-12, PageID.4978.) But that might be because of the informal way in which Eigenberger conducted the job search. Indeed, Eigenberger believes he interviewed Dickson for about 40 minutes: "I was in her office asking her questions about the job and . . . how did she think she would do in the job, . . . what she would do if she was a general manager, how she would operate, what her philosophies were." (ECF No. 55-3, PageID.3862; *but see* ECF No. 55-3, PageID.3870.)

Interviewed or not, Dickson was not hired for the general manager position. Michael Cannon was. Cannon had worked for Adams Outdoor as the Kalamazoo general manager from 2003 to 2007. (ECF No. 45-3, PageID.2872; *see also* ECF No. 55-13, PageID.5087.) In 2007, Cannon left Adams Outdoor (or, perhaps, was terminated) because he did not see eye-to-eye with Gleason about how rates should be set. (ECF No. 55-2, PageID.3582, 3612; ECF No. 55-12, PageID.4933–4934.) But during the spring or summer of 2015, Cannon called Gleason. (ECF No. 55-12, PageID.4935; ECF No. 55-2, PageID.3614.) Gleason recalls Cannon saying, "I was young. I came out of cable as a phenom. I [thought] I knew everything. I didn't listen to you. I didn't listen to my peers." (ECF No. 55-2, PageID.3614.) Gleason further recalls, "I thought [Cannon's explanation] sounded very compassionate. I thought it sounded very humble. I thought maybe . . . the spots on the leopard had changed, because Mike is a good media guy." (ECF No. 55-2, PageID.3614–3615.)

Eigenberger says he selected Cannon for the general manager position because Cannon had "20 plus years of media management background," "outdoor experience," had time to "internalize

what he did right and what he did wrong" during his prior stint at Adams Outdoor, and offered "a very good plan for [self] improvement." (ECF No. 55-3, PageID.3873.)

Dickson recalls Eigenberger informing her that she could not permanently manage the Ann Arbor market without "more outdoor [advertising] experience." (ECF No. 55-7, PageID.4282–4283.) Eigenberger says he spoke with three people who had worked with Dickson, including McWilliams and "one was ambivalent and the other two said that they think she would make a poor general manager." (ECF No. 55-3, PageID.3855.) McWilliams remembered telling Eigenberger, "I didn't think [Dickson] was ready." (ECF No. 55-5, PageID.4116.)

After learning that she did not get the general manager position, Dickson made a report to Buck (the person in the Ann Arbor office responsible for HR duties). Dickson recalls, "I told [Buck] I believe that I was passed over because I'm a woman." (ECF No. 55-7, PageID.4314.) For his part, Buck does not recall a complaint related to Dickson's gender.[1] (ECF No. 55-10, PageID.4745.) Musto also recalls Dickson telling him on several occasions that Eigenberger did not seriously consider her for the position because she was a woman. (ECF No. 55-8, PageID.4515, 4517.)

Cannon started as the general manager for Ann Arbor on December 1, 2015. (ECF No. 55-12, PageID.4947.) Thus, the hierarchy became:

Gleason (CEO)
↑
Eigenberger (Regional Sales Manager) ↔ Grant (HR VP)
↑
Cannon (General Manager, Ann Arbor)
↑
Dickson (General Sales Manager, Ann Arbor)

---

[1] Throughout this opinion, the Court uses the term "gender" as that is the term the parties have used. But there may be a distinction between "gender" and "sex." *See* Merriam-Webster, *Are gender and sex the same? Usage Guide*, https://www.merriam-webster.com/dictionary/gender (last visited Dec. 13, 2019).

↑

Musto (Sales Manager, Ann Arbor)

↑

Account Executives (except Dellas and Topping)

(*See* ECF No. 57-14, PageID.5899; ECF No. 57-4, PageID.5769.)

## F.

Within the first month or two of his employment, Cannon made a gender-based remark. Dickson recalls Cannon saying that there were "too many women" on the staff in the Ann Arbor office and "they" lead to "too much drama." (ECF No. 55-7, PageID.4323.) Musto does not recall Cannon using those precise words; according to Musto, the two discussed the general makeup of the sales team in terms of experience and skills and in that context, Cannon said, "you do have a team that is mostly female now, so for your next hire start thinking about your overall make up of your team." (ECF No. 55-8, PageID.4556–4557.)

## G.

In the December 2015 to January 2016 timeframe, there were also discussions about the Ann Arbor office having too many managers: Cannon, Dickson, and Musto. Cannon recalls that within his first week on the job he sat down with Dickson and Musto about the issue. (ECF No. 55-11, PageID.4831–4832.) Cannon believed that with all three of them, and with him working fulltime in the office (unlike McWilliams), there would be "too much duplication of duty." (ECF No. 55-11, PageID.4832.) Indeed, Cannon recalls raising that concern with Eigenberger "well before" he accepted the general manager job. (ECF No. 55-11, PageID.4833.)

Musto and Dickson also discussed the three-manager issue. Musto recalls, "[Dickson] and I were very open with each other that we were going to have one too many managers in the Ann Arbor market." (ECF No. 55-8, PageID.4525; *see also* ECF No. 55-7, PageID.4386.) Musto thought that someone would have to go because "every other market in the company had a two

manager system, a general manager, and a sales manager." (ECF No. 55-8, PageID.4525.) According to Musto, "[Dickson] said that in no way would she make a play for my job. . . . She said there were two reasons. One, she would never do that to me as a friend, and two, no offense, Mike, but that would be a step back from my current position and I'm not interested in going backwards." (ECF No. 55-8, PageID.4526, 4529.) In this timeframe, Dickson texted Musto that she thought she was going to be fired. (ECF No. 60-3, PageID.6216.)

**H.**

In late January 2016, Dickson emailed Buck asking for a copy of the general sales manager job description. (ECF No. 55-18, PageID.5313.) Dickson's email eventually reached Cannon. (*See* ECF No. 55-18, PageID.5312.)

That prompted Cannon to email Eigenberger, Grant, and Buck: "We need to keep an eye on this. Especially from past instances along with 90 day review of performance and heavy on the management side." (ECF No. 55-18, PageID.5312.) Cannon's reference to "past instances" was based on his (incorrect) belief that Dickson had sued one of her prior employers. (ECF No. 55-12, PageID.4972; *see also* ECF No. 55-24, PageID.5550.) The "90 day review of performance" was apparently a reference to Cannon's plan to observe and evaluate the Ann Arbor office during his first 90 days on the job. (ECF No. 55-11, PageID.4836–4837.) Cannon's reference to "heavy on the management side" was, apparently, the fact that Ann Arbor had three managers.

Grant responded to Cannon's email: "It's pretty simple. Determine who is needed in your group, MJ or Mike [Musto] and lay the other off. If it's Mike [Musto], you'll need to address the issue of [Dickson's] job title since you don't need a GSM in AA with a fulltime GM. Don't try to shoe horn MJ into the Southfield office. That's only going to lead to more problems later." (ECF No. 55-18, PageID.5311.)

In response to Grant's email, Eigenberger stated, "Agree on all accounts . . . sooner the better." (ECF No. 55-18, PageID.5311.)

A few days later, on January 26, 2016, Eigenberger emailed Grant, "Should exile MJ to Indiana to be the GM." (ECF No. 57-30, PageID.6142.)

## I.

Eigenberger's "exile" email was in reference to a situation that had arisen a few weeks earlier: on January 5, 2016, the general manager of Adams Outdoor's Indiana market quit. (ECF No. 57-17, PageID.5996.) Upon receiving notice of the resignation, Eigenberger emailed Grant, "Now what do I do? It's a shit job." (ECF No. 57-17, PageID.5995.) Later that same day (January 5), Eigenberger again emailed Grant, this time with some possible solutions. Among the listed possibilities was, "Have MJ from Ann Arbor fly in there two days a week[] (they have an abundance of manager[s] in Ann Arbor so they can spare one)." (ECF No. 57-17, PageID.5995.)

Ultimately, though, Dickson was not awarded (or, depending on perspective, forced to take) the part-time, interim general manager position in Indiana. Instead, Cannon and Eigenberger had Dickson's direct report, Musto, travel to Indiana for two or three days a week. (*See* ECF No. 55-11, PageID.4853; ECF No. 55-7, PageID.4329.)

Dickson believes she did not get the job because of her gender. She remembers Musto telling her that the reason she did not get the position was because she was a "single mom." (ECF No. 55-7, PageID.4327.) Dickson also remembers asking Cannon why she did not get the job; Cannon allegedly responded, "we didn't think you would be interested because we knew you're a single mom." (ECF No. 55-7, PageID.4328.) Musto recalls the situation similarly: "I asked Mike [Cannon], Mary Jane is my boss, wouldn't she be the more appropriate person for this position? To which [Cannon] replied, she's a single mom, she has a disabled son or a son with autism—I

don't want to put the exact quote in [Cannon's] mouth, but something like that, and the travel back and forth would be a lot, so we're asking you." (ECF No. 55-8, PageID.4473.) (Although it matters little on summary judgment, Cannon says that he did not even know Dickson was a single mom at the time. (ECF No. 55-11, PageID.4855; *see also* ECF No. 55-11, PageID.4853–4854.) And it is also worth noting that Musto had children as well.)

Although the Indiana job was arguably undesirable, part time, and short term, Dickson suggests that she would have taken the job had she been offered it. (ECF No. 55-7, PageID.4328.)

**J.**

On February 1 and February 2, 2016, Grant raised two issues with Dickson. On February 1, Grant sent Dickson an email asking if Topping and Dellas, the two account executives in Southfield who reported directly to Dickson, had been using the term "national" in their titles when sending email and posting on social media. (ECF No. 60-4, PageID.6226–6227.) It was Grant's belief that Topping and Dellas were hired as "local" account executives and thus should not have been using a "national" designation. (ECF No. 60-4, PageID.6226.) On February 2, Grant emailed Dickson about what he believed were incomplete target income analyses—effectively annual financial goals for account executives. (ECF No. 60, PageID.6219.) Grant stated that "[t]hey should have been completed a month ago." (ECF No. 60, PageID.6219.)

Minutes after emailing Dickson about the target income analyses, and apparently before Dickson had even responded, Grant sent Gleason and Eigenberger an email with "unsolicited feedback and observations" of Dickson. (ECF No. 57-19, PageID.5999.) The email was critical of Dickson. In part, Grant wrote, "My personal interactions with her as well as limited feedback I received from the market indicates she's probably not the type and quality of individual we wanted in any type of leadership capacity whether it's with [Adams] or [Fairway] and I am recommending

that we resolve the issue and exit her out of the organization as quickly as is practical." (*Id.*) Grant continued, "I rarely take this type of position with anyone but I have a very uneasy feeling about her style and approach. . . . The simple solution will be to provide her a small severance agreement explaining to her that we are restructuring the sales management team and that there is no longer a need for a GSM in the market with a full-time, dedicated GM running the market." (*Id.*) Grant's email to Eigenberger and Gleason concluded, "I felt it important to provide my two cents on this with the intent of supporting Mike Cannon and . . . avert any exposure to the organization given her prior litigious nature with other companies." (*Id.*)

## K.

Although it is unclear whether he did so before or after Grant's email, Cannon reached a decision about whether to keep Dickson or Musto. In particular, Cannon recommended to Gleason and Eigenberger that the general sales manager position in Ann Arbor be eliminated. (ECF No. 55-11, PageID.4839.) Cannon says his recommendation was based on several factors, including that when he started as general manager he noticed that the "morale" in the office was low, that human resources had given him the "riot act" because of late target income analyses, and that some of his and Dickson's responsibilities were duplicative. (ECF No. 55-11, PageID.4840–4848.) Cannon says he did not replace Musto with Dickson because Musto was "the best fit" for the sales manager position: "He is a roll up your sleeve, get out in front of the customers, nonstop activity guy. And that's what the role is." (ECF No. 55-11, PageID.4852.)

Cannon recalls giving Gleason and Eigenberger his recommendation over the phone before the meeting in Mexico and being told that they would let him know. (ECF No. 55-11, PageID.4839; *see also* ECF No. 55-11, PageID.4945 (indicating collaborative decision); ECF No. 55-13, PageID.5119 (indicating final decision was Gleason's).) But Gleason, Eigenberger, and Grant each

maintains that the decision on who to eliminate from the Ann Arbor office (Musto or Dickson) rested with Cannon. (ECF No. 55-2, PageID.3666; ECF No. 55-3, PageID.3909, 3918; ECF No. 55-24, PageID.5508.)

## L.

Between February 4 and February 7, 2016, managers from Adams Outdoor and Fairway Outdoor held a meeting in Punta Mita, Mexico. (ECF No. 55-7, PageID.4333; ECF No. 55-19, PageID.5315.) Cannon explained, "Adams looks at those meetings, it's a time to enjoy, have fun, let off some steam." (ECF No. 55-11, PageID.4871.)

According to Dickson, Grant went well beyond fun. Dickson remembers that on one night of the retreat, Grant bought shots for two female employees, Nancy Rigby and Julie Johnson. Dickson further recalls that the next night, Grant danced with Ashley Love. According to Dickson, Rigby saw the two dancing and said something like "Look at Grant." (ECF No. 55-7, PageID.4345.) Dickson recalls that she and Johnson then turned to look at Grant: "[Grant had] heard [Rigby], saw me and we locked eyes. He knew, he knew he was caught." (ECF No. 55-7, PageID.4345.) According to Dickson, Grant was dancing with his "face in the back of [Love's] neck, in her hair and he was inappropriately dancing up against her back. She was extremely intoxicated." (ECF No. 55-7, PageID.4338; *see also* ECF No. 55-7, PageID.4342 ("I could see him. . . . [r]ubbing up against her back with his front and his face in her back of her neck.").) Having been caught, says Dickson, Grant went up to Rigby and Johnson and said, "Don't forget about your shots" or "Don't forget about who bought your shots." (ECF No. 55-7, PageID.4344– 4345, 4348.)[2]

---

[2] The Court fully accepts Dickson's account on summary judgment. But other accounts of the incident varied greatly. Richard Zecchino recalls Grant dancing with Love and that Grant may have put his head in Love's neck. (ECF No. 57-20, PageID.6058.) But Zecchino also says, "I don't

During the trip, Grant also took a picture in which he is grabbing the breast of a female statue and another male employee is placing his mouth on or around the breast area. (*See* ECF No. 55-26, PageID.5701.) The picture was taken in the presence of other Adams Outdoor employees. (ECF No. 55-24, PageID.5515–5516.) The night after the picture was taken, an employee showed it to Dickson. (ECF No. 55-7, PageID.4350.)

Grant recalls, "several managers came up to me and told me when we were in Mexico, 'Be careful with MJ. She seems to ask all sorts of questions like, "Did you see this? Did you see that? Did you see this? Did you see that?"' . . . She asked a lot I guess about my conduct, behavior with females at Mexico." (ECF No. 55-25, PageID.5646–5648; *cf.* ECF No. 57-15, PageID.5965–5966.)[3] At some point during the retreat, Grant and Eigenberger asked Cannon to tell Dickson to "tone things down" or lighten up. (ECF No. 55-25, PageID.5654; ECF No. 55-11, PageID.4871.)

**M.**

When Dickson returned from Mexico, she reported Grant's conduct to Buck. (ECF No. 55-7, PageID.4356.) For his part, Buck says, "I remember [Dickson] telling me that she was in Mexico and she—I asked how Mexico was. She said, you know, it's Adams. . . . And she said Grant was

---

believe from what I witnessed that . . . that any of Brian Grant's dancing was anything more than consenting adults dancing together. Nobody was offended." (ECF No. 57-20, PageID.6059.) Grant believes he did not dance at all. (*See* ECF No. 55-24, PageID.5502; ECF No. 55-25, PageID.5654.) Love says that she did not dance with Grant and that "Grant did not sexually harass me or display sexually inappropriate behavior toward me at the Managers Retreat in February 2016." (ECF No. 55-20, PageID.5331–5332.) Johnson does not remember whether Grant danced with Love. (ECF No. 55-22, PageID.5412.) Others said that they saw Grant dancing but that he was dancing in a group and that they did not recall him dancing inappropriately with Love. (ECF No. 55-8, PageID.4548–4549 (Musto); ECF No. 55-11, PageID.4878 (Cannon).)

[3] At points during his multi-day deposition in this case, Grant contradicted himself. This may be partly attributable to a stroke Grant suffered not long before he was deposed. (*See* ECF No. 57-15, PageID.5977; ECF No. 55-24, PageID.5524.) Although Adams Outdoor asserts that Grant's testimony is not reliable, it has not moved to exclude his testimony. (*See* ECF No. 60, PageID.6205.)

laughing, flirting, buying shots. . . . I think she said he was dancing." (ECF No. 55-10, PageID.4761.) Buck says that Dickson did not tell him that Grant was dancing with his face buried in Love's neck. (*Id.*) Buck also did not think that Dickson was making a complaint. (ECF No. 55-10, PageID.4769.)

Buck is certain that he never told anyone about what Dickson told him. (ECF No. 55-10, PageID.4769 ("zero possibility").) But Cannon recalls that Buck did talk to him about Grant's behavior in Mexico. (ECF No. 55-13, PageID.5036–5037.) Grant says that he never received a complaint from Buck about Mexico. (ECF No. 55-24, PageID.5507.)

### N.

On February 10, 2016, the day after Dickson reported Grant's behavior to Buck, Eigenberger wrote an email (apparently to Cannon) asking, "What's the plan for MJ?" (ECF No. 57-25, PageID.6128.) Cannon responded that he had talked with Grant and that Grant would be ready with the paperwork for eliminating the general sales manager position on February 17. (ECF No. 57-2, PageID.6127; ECF No. 55-11, PageID.4905.) Cannon indicated that if they were going to eliminate the position on February 17, he would need Musto in Ann Arbor "full time" (apparently, Musto had been spending time in Indiana as the interim general manager there). (*See* ECF No. 57-2, PageID.6127; ECF No. 55-11, PageID.4905.) Eigenberger responded, "I guess if you need Musto full time th[e]n we should hold back." (ECF No. 57-2, PageID.6127.) Grant, who had been copied on that email, wrote to Eigenberger, "This woman is a cancer in the AA environment. We need to move on her now. Indiana will have to fend for itself." (ECF No. 57-2, PageID.6127.) Grant did not think Dickson should be transferred to Indiana. (ECF No. 55-25, PageID.5662–5663.)

As planned, Adams Outdoor terminated Dickson on February 17, 2016. (ECF No. 55-7, PageID.4360–4361.) Dickson was not given an opportunity to move to a different position in Adams Outdoor or Fairway Outdoor. (ECF No. 45, PageID.2874; *see also* ECF No. 55-25, PageID.5662–5663.)

### O.

Over a year later, in August 2017, Dickson sued Adams Outdoor for violating Title VII of the Civil Rights Act of 1964 (as amended) and Michigan's Elliott-Larsen Civil Rights Act. The parties engaged in extensive discovery. Adams Outdoor now seeks summary judgment. (ECF No. 55.)

### II.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### III.

In this part, the Court addresses Dickson's discrimination claims under Title VII and Michigan's Elliott-Larsen Civil Rights Act. In Part IV, the Court addresses Dickson's retaliation claims under those two laws.

### A.

At summary judgment, a discrimination claim under Title VII can be analyzed using one of three methods. Selecting the proper method turns on whether the employee advances a single-motive theory (the adverse action occurred because of discrimination) or a mixed-motive theory (although non-discriminatory reasons motived the adverse action, so did discrimination). It also turns on whether the employee offers "direct" or "indirect" (i.e., circumstantial) evidence of

discrimination in support of her theory. When an employee advances a single-motive theory supported by "indirect" evidence of discrimination, the employee typically resorts to the *McDonnell Douglas* framework. *See White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 n.10 (6th Cir. 2008); *Wright v. Southland Corp.*, 187 F.3d 1287, 1290–92, 1291 n.5 (11th Cir. 1999) (explaining that as opposed to a traditional summary-judgment framework, *McDonnell Douglas* "make[s] matters somewhat easier for plaintiffs"). But when the employee offers "direct" evidence in support of her single-motive theory, the *McDonnell Douglas* framework does not apply. *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 776, 784 n.6 (6th Cir. 2016); *Terbovitz v. Fiscal Court of Adair Cty.*, 825 F.2d 111, 114 (6th Cir. 1987) (explaining why *McDonnell Douglas* is not necessary with direct evidence of discrimination), *abrogated on other grounds by Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). So a claim pursued under a single-motive theory has two modes of analysis. A third method of analysis is used to decide whether a mixed-motive claim should proceed to a jury. *See White*, 533 F.3d at 400.

Two of Dickson's three claims of discrimination will be analyzed under the mixed-motive framework. Although Dickson's brief appears to conflate the direct-indirect distinction with the single-mixed distinction, she does assert that her gender was "a motivating factor" in (1) not being offered the Indiana position and (2) eliminating the Ann Arbor general sales manager position. (ECF No. 57, PageID.5735.) Dickson's use of the term "a motivating factor" tracks the language of Title VII's mixed-motive provision. *See* 42 U.S.C. § 2000e-2(m). Further, Dickson quotes from *White v. Baxter*, the Sixth Circuit case clarifying how mixed-motive claims should be analyzed at the summary-judgment stage. (*See* ECF No. 57, PageID.5735, 5737.) Thus, insofar as Dickson claims that Adams Outdoor discriminated when it did not give her the Indiana position and when

it removed her from the company, Dickson has done enough to invoke the mixed-motive method of analysis set out in *White v. Baxter*.

Dickson advances her third discrimination claim, that Adams Outdoor discriminated when it did not promote her to general manager of the Ann Arbor office, under a single-motive theory. (*See* ECF No. 57, PageID.5738–5745.) And she offers no direct evidence that Adams Outdoor discriminated when it hired Cannon as the general manager instead of promoting her. (*See id.*) So, insofar as Dickson claims that Adams Outdoor discriminated when it failed to promote her, the Court will apply the *McDonnell Douglas* framework.

Having determined the proper method of analysis for each discrimination claim, the Court turns to analyzing Dickson's three claims.

**B.**

The Court starts with Dickson's claim that she was not promoted to general manager of the Ann Arbor office because of her gender.

The first two steps of the *McDonnell Douglas* framework do not require extended discussion. At the first step, an employee is required to establish a prima facie case of discrimination. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). Here, that means Dickson must show she "applied for and was qualified for a promotion" to general manager and that a male got the position instead of her. *See Warf v. U.S. Dep't of Veterans Affairs*, 713 F.3d 874, 879 (6th Cir. 2013). Cannon is, obviously, male. And Adams Outdoor does not dispute Dickson's claim that she sought and was qualified for the job. (*See* ECF No. 55, PageID.3439.) To the contrary, Adams Outdoor proceeds under the assumption that Dickson can establish a prima facie case of discrimination. (*See id.*)

At the second step of the *McDonnell Douglas* framework, the employer must "set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr.*, 509 U.S. at 507. Here, Adams Outdoor claims that Cannon was more qualified than Dickson to be the general manager of the Ann Arbor office and cites evidence in support of its claim. (ECF No. 55, PageID.3428, 3439.) Dickson does not argue that the cited evidence does not discharge Adams Outdoor's burden at step two of the *McDonnell Douglas* framework. (*See* ECF No. 57, PageID.5738.)

So the battleground for Dickson's failure-to-promote claim is limited to the final step of the *McDonnell Douglas* framework. That step typically involves deciding whether a reasonable jury could find that the employer's stated reason for the adverse action (here, that Cannon was better qualified) is pretextual. *See Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000). The idea is that "once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." *Id.* at 147. But showing that the employer's given reason is a pretext for discrimination is not the only way an employee can proceed to show that her discrimination claim deserves a jury's consideration. *See St. Mary's Honor Ctr.*, 509 U.S. at 510 ("[T]he trier of fact proceeds to decide the ultimate question: whether plaintiff has proven that the defendant intentionally discriminated against [her] because of [her gender]." (internal quotation marks and alterations omitted)); *Wright v. Southland Corp.*, 187 F.3d 1287, 1290–92, 1291 n.5 (11th Cir. 1999) (discussing purpose of *McDonnell Douglas* and providing that after step two, "the plaintiff returns to the traditional [summary-judgment] framework, but with an additional piece of evidence—the employer's proffered reason for the action"). But here, Dickson argues at

length that Adams Outdoor's reasons for preferring Cannon over her are false. (ECF No. 57, PageID.5739.) Accordingly, the Court examines whether a reasonable jury could disbelieve Adams Outdoor's reasons for hiring Cannon instead of Dickson.

Eigenberger was the person primarily, if not solely, responsible for selecting the next general manager of the Ann Arbor office. He recalls having several non-discriminatory reasons for choosing Cannon over Dickson. Eigenberger says that Cannon got the job because he had "20 plus years of media management background," outdoor advertising experience, was able to "internalize what he did right and what he did wrong" during his first stint as an Adams Outdoor general manager, and had a plan to improve. (*Id.*) According to Eigenberger, Cannon's plan to improve involved "[l]isten[ing] more, be[ing] more of a visionary, be[ing] more understanding of changes, be[ing] open to change, be[ing] able to recruit better, understanding the market better, [and] understanding outdoor better." (ECF No. 55-3, PageID.3873.) Eigenberger also says that he hired Cannon because he was not as "divisive" as Dickson. (ECF No. 55-3, PageID.3872.) Further, Eigenberger recalls speaking with a few of Dickson's coworkers during the hiring process and receiving less than stellar feedback about her. (ECF No. 55-3, PageID.3855.) Eigenberger also told Dickson that the reason she did not get the job was because she needed more outdoor experience. (ECF No. 55-7, PageID.4282–4283.)

A reasonable jury could find Eigenberger's reasons for preferring Cannon over Dickson were false or, if true, were not an adequate basis for hiring Cannon over Dickson. *See Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 320 (6th Cir. 2019) ("Generally speaking, an employee can show that an employer's explanation was pretextual in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually

motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." (internal quotation marks omitted)).

As an initial matter, a reasonable jury could disbelieve that Eigenberger hired Cannon in part because he had more outdoor advertising experience than Dickson. It is true that Cannon, unlike Dickson, had worked as a general manager of an Adams Outdoor office for four to five years. And the market he managed, Kalamazoo, was similar in size to the Ann Arbor market. (ECF No. 55-11, PageID.4830, 4835.) But by the time Eigenberger was searching for a general manager, Dickson had worked at Adams Outdoor for about eight months. Further, Dickson had done the very job she was interviewing for. Eigenberger admits as much: "[B]asically by the nature of her role after [McWilliams] left, she was auditioning for the GM spot every day." (*See* ECF No. 55-3, PageID.3854.) More importantly, Eigenberger said that Haaksma was his first choice for the general manager position—and Haaskma had no outdoor advertising experience. (ECF No. 55-3, PageID.3861.) Thus, a jury could find that outdoor advertising experience "did not actually motivate," *Babb*, 942 F.3d at 320, the selection of Cannon over Dickson.

A reasonable jury could also doubt that Cannon's "20 plus years of media management background" actually motivated the selection of Cannon over Dickson. True, by the time he rejoined Adams Outdoor in 2015, Cannon had over 20 years of experience in advertising. (*See* ECF No. 45-3, PageID.2871–2873.) And he had been a general manager at Comcast, Adams Outdoor, and Viamedia. (*See* ECF No. 45-3, PageID.2871–2873.) But prior to joining Adams Outdoor, Dickson had been an account executive for a newspaper, a television station, and a radio station. (ECF No. 45, PageID.2871–2872.) More importantly, Dickson served as a general sales manager for Comcast, a general manager for Cumulus Media, an acting general manager for Viamedia, and a station manager for Radio Disney. (ECF No. 45, PageID.2871–2873.) In other

words, like Cannon, Dickson had considerable managerial experience, including as a general manager. And like Cannon, Dickson had worked in the industry for more than 20 years. (ECF No. 45, PageID.2871–2873.) So a reasonable jury could doubt that Eigenberger preferred Cannon over Dickson because he had greater experience.

A reasonable jury could also find that Dickson was unjustifiably cast as "divisive." First, it appears that Dickson's "divisive" reputation was in part attributable to her efforts to change how account executives made out-of-market sales. (*See* ECF No. 55-3, PageID.3843, 3902; ECF No. 57-8, PageID.5778–5779.) That certainly ruffled the feathers of those in Lansing. But Adams Outdoor has not shown that Dickson's policy change was not warranted. In other words, while the change may have been unpopular, Adams Outdoor has not shown that the change was bad for business. So a reasonable jury could infer that the policy change should have favored rather than disfavored Dickson's promotion. Second, one of the people that Eigenberger recalls describing Dickson as "toxic" denies ever saying that about Dickson. (*Compare* ECF No. 55-3, PageID.3902, *with* ECF No. 55-15, PageID.5162.) Third, as Dickson points out, a number of Adams Outdoor employees in the Ann Arbor office got along well with Dickson. (ECF No. 57-8, PageID.5779 (Dellas); ECF No. 57-10, PageID.5836 (Sjoberg).) According to Sjoberg, "Dickson was a good manager. Everyone loved her." (ECF No. 57-10, PageID.5836.) And, when Dickson was fired, Topping told Dickson that Dickson was "one of the most professional women that [she had] ever known." (ECF No. 57-32, PageID.6144.) As such, a reasonable jury could think that Eigenberger exaggerated Dickson's "divisive" nature.

As for the less-than-stellar feedback Eigenberger received about Dickson during the hiring process, a reasonable jury could find that the feedback (alone or with the reasons so far discussed) was "insufficient to motivate," *see Babb*, 942 F.3d at 320, the decision to hire Cannon over

Dickson. According to Eigenberger, two people thought Dickson "would make a poor general manager." (ECF No. 55-3, PageID.3855.) But it is entirely unclear how familiar these two people were with Dickson's day-to-day performance at the Ann Arbor office (one was a general manager of an Adams Outdoor office in North Carolina and the other did not even work with Dickson at Adams Outdoor). (ECF No. 55-3, PageID.3855–3856.) And the third person Eigenberger recalled getting feedback from, McWilliams (the general manager of the Ann Arbor office when Dickson started at Adams Outdoor), neither endorsed nor disapproved of Dickson. According to Eigenberger, McWilliams was "ambivalent" and "thought she was doing okay, not great." (ECF No. 55-3, PageID.3856.) Moreover, the record does not reflect whether Eigenberger solicited feedback from people Cannon had worked with and, if he did, whether that feedback was comparably negative. Indeed, Cannon had been let go from Adams Outdoor because he did not comply with how the CEO wanted to run the Kalamazoo market. Yet Eigenberger and Gleason were prepared to give Cannon a second chance because he expressed willingness to change. It is not clear whether Eigenberger raised any performance or relationship issues with Dickson during her interview and allowed her to express willingness to change. (ECF No. 55-3, PageID.3873 ("We talked about improvement plans, but I don't remember those specific things.").) Further, at least Musto thought Dickson was ready to be general manager: when Eigenberger approached him about the position, Musto told Eigenberger that "MJ was your guy." (ECF No. 55-8, PageID.4598.) So a reasonable jury could find that any negative feedback about Dickson that Eigenberger obtained was not sufficient to motivate his decision to hire Dickson over Cannon.

To sum up so far, a reasonable jury could find that the reasons Eigenberger provides for hiring Cannon over Dickson "had no basis in fact, "did not actually motivate" the hiring decision, or "were insufficient to motivate" the hiring decision. *See Babb*, 942 F.3d at 320.

But it does not automatically follow from that determination that Dickson's failure-to-promote claim should proceed to a jury. *See Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148 (2000) ("[T]here will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory."). Here, though, a reasonable jury could couple its doubts about Eigenberger's reasons for selecting Cannon with other evidence of discrimination.

In particular, the record contains considerable evidence that Eigenberger was biased against female employees. Dickson says that Eigenberger talked over her and cut her off when she spoke and that she never saw Eigenberger do the same to men in the Ann Arbor office. (*See* ECF No. 55-7, PageID.4332.) Dellas recalls a meeting where Eigenberger was "really kind of nasty" to Dickson and thinking to herself, "you've kind of got to develop thick skin if you work with a bunch of men and this is sort of the playing field." (ECF No. 55-16, PageID.5244.) Both Sjoberg and Dellas declare that "[t]he difference between how [Eigenberger] treated [Dickson] versus how he treated men like Mike Musto was very obvious." (ECF No. 57-8, PageID.5779; ECF No. 57-10, PageID.5836.) According to Sjoberg, Eigenberger would single out women in meetings much more often than men. (ECF No. 55-9, PageID.4677.) Sjoberg and Dellas also recall Eigenberger objectifying Brendengen, which made Brendengen very uncomfortable. (ECF No. 57-8, PageID.5779; ECF No. 57-10, PageID.5836.) And Johnson recalls Eigenberger forcing her to kiss him. (ECF No. 55-22, PageID.5414.) Based on Eigenberger's treatment of women in the workplace, a reasonable jury could find that he assessed the job performances of male and female employees differently based on gender.

In short, a reasonable jury could couple its doubts about Eigenberger's reasons for preferring Cannon over Dickson with evidence of Eigenberger's workplace treatment of women to conclude that Adams Outdoor "intentionally discriminated against [Dickson] because of [her gender]," *St. Mary's Honor Ctr.*, 509 U.S. at 510.

Resisting this result, Adams Outdoor stresses that it is free to choose among qualified candidates. But that freedom ends where discrimination begins. Adams Outdoor's cases are not to the contrary. The company quotes a portion of *Browning v. Dep't of Army*, 436 F.3d 692, 696 (6th Cir. 2006), that comes from *Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir. 1987). Yet *Wrenn* said exactly what this Court just said: "*So long as its reasons are not discriminatory*, an employer is free to choose among qualified candidates." 808 F.2d at 502 (emphases added).

Adams Outdoor also cites *Bender v. Hecht's Department Stores*, 455 F.3d 612 (6th Cir. 2006), in support of its motion for summary judgment. (ECF No. 55, PageID.3440–3441.) But *Bender* merely held that when an employee seeks to establish pretext *solely* with qualifications evidence, she must show that her qualifications were "significantly better" than the qualifications of the person who got the job. 455 F.3d at 627. Here, Dickson's pretext evidence is more than just her qualifications—she also has evidence that the decisionmaker was biased. So *Bender* is no help to Adams Outdoor. *See Bender*, 455 F.3d at 627 ("In the case in which a plaintiff does provide other probative evidence of discrimination, that evidence, taken together with evidence that the plaintiff was as qualified as or better qualified than the successful applicant, might well result in the plaintiff's claim surviving summary judgment.").

In short, Adams Outdoor is not entitled to summary judgment on Dickson's failure-to-promote claim.

**C.**

The Court thus turns to Dickson's claims that Adams Outdoor discriminated when (1) it denied her the Indiana position and (2) it removed her from the company.

As noted, Dickson has argued these two claims using a mixed-motive theory. Thus, as discussed, the framework set out *White v. Baxter Healthcare Corp.*, 533 F.3d 381 (6th Cir. 2008), should be used to analyze these claims at the summary-judgment stage. In particular, "to survive a defendant's motion for summary judgment, a Title VII plaintiff asserting a mixed-motive claim need only produce evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) 'race, color, religion, sex, or national origin was a motivating factor' for the defendant's adverse employment action." *Id.* at 400. "This burden of producing some evidence in support of a mixed-motive claim is not onerous and should preclude sending the case to the jury only where the record is devoid of evidence that could reasonably be construed to support the plaintiff's claim." *Id.*

**1.**

Of Dickson's two mixed-motive claims, the Court starts with the claim that Dickson's gender was a motivating factor in the decision not to give her the general manager position in Indiana.

This claim does not require extended discussion. Taking the record in the light most favorable to Dickson, Cannon stated that Dickson did not get the Indiana position because she was a "single mom." (ECF No. 55-7, PageID.4328; ECF No. 55-8, PageID.4473.) While perhaps this comment could be interpreted as parental-status discrimination, Cannon did not say "single parent." And Musto had kids. (ECF No. 55-8, PageID.4494.) Further, about a month or so earlier, Cannon had remarked that the Ann Arbor office had "too many women" and that they led to "too

much drama." (ECF No. 55-7, PageID.4323.) So there is reason for a jury to think that Cannon was biased against female employees in the Ann Arbor office. True, Cannon has a different account of why Musto was selected for the Indiana position (ECF No. 55-11, PageID.4853–4855), but at the summary-judgment stage, the Court accepts Dickson's version.

Adams Outdoor argues that even if Cannon stated that Dickson did not get the Indiana job because she was a "single mom," Cannon was not the decisionmaker. So, says Adams Outdoor, his comment was merely a stray remark insufficient to show that discrimination motivated the decision to give Musto the position. (*See* ECF No. 60, PageID.6201.)

This argument does not persuade. Again, according to at least Dickson and Musto, Cannon said that the reason Dickson did not get the job was that she was a "single mom." So a reasonable jury could find that even if Cannon was not a decisionmaker, someone at Adams Outdoor denied Dickson the Indiana job in part because of her gender. And Dickson has sued Adams Outdoor, not Cannon. In any event, there is evidence that Cannon was a decisionmaker: Cannon testified that he and Eigenberger jointly decided that Musto should get the job. (ECF No. 55-11, PageID.4853; *see also* ECF No. 55-7, PageID.4329.) Again, at this stage of the case, the Court must assume that a jury could credit the account that supports the non-moving party, Dickson.

In short, a reasonable jury could find that Dickson's gender was a motivating factor in Adams Outdoor's decision to not give her the part-time, interim general manager position in Indiana.

**2.**

That leaves Dickson's second mixed-motive claim: she says that her gender was a motivating factor in Adams Outdoor's decision to terminate her employment.

To start, it helps to precisely articulate the adverse action. If Dickson had claimed that the adverse action was no more than the elimination of the general sales manager position from the Ann Arbor office, Adams Outdoor might be entitled to summary judgment on this claim. It appears that the Ann Arbor market was too small to need a general manager, a general sales manager, and a sales manager. (*See e.g.*, ECF No. 55-11, PageID.4896.) And it appears that Cannon, Dickson, and Musto (or at least Cannon and Dickson) had some overlapping responsibilities. (ECF No. 55-11, PageID.4841.) Although Dickson claims that one solution to the three-manager issue might have been to assign her to the Southfield office (ECF No. 57, PageID.5754–5755), Dickson does not explain how this would have eliminated the overlap. And Cannon says that it would not have. (ECF No. 55-11, PageID.4850.) So, arguably at least, someone had to go. And it would have made little sense for Adams Outdoor to let Cannon go a month or two after hiring him. So either Dickson or Musto had to leave. Cannon says Musto's skill set fit the sales manager position very well (ECF No. 55-11, PageID.4852)—a point which Dickson does not dispute (indeed, she had hired Musto for that very job). Further, it appears Dickson was not interested in Musto's sales manager position; according to Musto, Dickson did not want to take a friend's job and also thought it would be "a step back." (ECF No. 55-8, PageID.4526, 4529.) So a case could be made that whether a man or woman held the general sales manager position in Ann Arbor, the position needed to be eliminated.

But Dickson not only complains about the elimination of her position, she also complains that Adams Outdoor gave her no opportunity to work elsewhere in the organization. (*See* ECF No. 22, PageID.110 ¶ 45.g; ECF No. 57, PageID.5724–5725, 5754, 5755.) Dickson notes that when a general sales manager position was eliminated in Madison, Wisconsin, the man that held the position was given a chance to work elsewhere in Adams Outdoor. (ECF No. 57, PageID.5725 n.6; *see also* ECF No. 57, PageID.5754 (asserting that displaced male employees received "soft

landings"); ECF No. 55-5, PageID.4135–4136.) Dickson also points out that Musto needed to be recalled to the Ann Arbor office after her position was eliminated, so the Indiana general manager position was vacant. (ECF No. 57, PageID.5755.) And while Musto recalls Dickson saying she did not want his position, Dickson avers, "I was never offered any alternative to separation and may have accepted a [sales manager] position or other position." (ECF No. 45, PageID.2874.)

So the asserted adverse action is not just position elimination but the elimination of Dickson from the company. As such, this is the question before the Court: Could a reasonable jury find that Dickson's gender was a motivating factor in completely removing her from the Adams Outdoor and Fairway Outdoor organizations?

The answer to that question depends in large part on how strongly non-gender-related reasons motivated Adams Outdoor to remove Dickson from the company. If non-discriminatory reasons all but compelled Dickson's ouster, then it is not likely that a discriminatory reason was "a motivating factor" in that action. So the Court starts to answer the question presented by examining Adams Outdoor's reasons for removing Dickson.

The summary-judgment record reflects that a collection of reasons led Adams Outdoor to completely remove Dickson from the company. Cannon recalls recommending the elimination of Dickson's position because staff in the Ann Arbor office were unhappy, he observed a poorly run meeting, managers in Ann Arbor had overlapping responsibilities, employee reviews had been completed at the last minute, Dickson had secretly changed a review, target income analyses were tardy, and Dickson had approved too much vacation time for Musto. (*See* ECF No. 55-11, PageID.4840–4849.) And, recall, Grant sent an email to Gleason and Eigenberger with "unsolicited feedback" about Dickson that recommended her termination. Grant says that the content of the email was based on his belief that Dickson "was always stirring the pot talking about

how terrible things were" (ECF No. 55-25, PageID.5631), that people in the Ann Arbor office "complained about her" (*id.* at PageID.5632), that Dickson was deceptive about issues, including Musto's vacation time and the late target income analyses (*id.* at PageID.5583–5584, 5630, 5634–5635), that Dickson was not supporting Cannon as general manager and instead telling employees that she was the best person for the job (*id.* at PageID.5642–5643), and that Dickson had sued her prior employer.

Although Dickson attempts to show that many of these reasons were false (*see* ECF No. 57, PageID.5748–5759), the precise issue is not whether they were true or false. If, at the time Adams Outdoor removed Dickson from the company, the decisionmakers honestly believed the reasons to be true, it would not matter that, after the fact, Dickson shows them to be false. *See Todd v. RBS Citizens, N.A.*, 483 F. App'x 76, 83 (6th Cir. 2012) (citing *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001)).

Moreover, at least some of the reasons given by Cannon and Grant find support in the summary-judgment record. For instance, while Dickson stresses that some account executives "loved her" (ECF No. 57, PageID.5748), Dickson does not contradict Cannon's testimony that Starr Brendengen indicated to him that "she just never had any good interactions with MJ to the point she's in tears every time she's in" (ECF No. 55-11, PageID.4841). Nor does Dickson dispute Cannon's testimony that his first sales meeting was "the most disrespectful" meeting he had ever observed. (ECF No. 55-11, PageID.4856.) As for the issue with Musto's vacation time, Dickson claims that it was McWilliams who authorized an extra week for Musto; in support, Dickson cites Cannon's and Grant's testimony. (ECF No. 57, PageID.5748.) But Cannon says he spoke with McWilliams and McWilliams did not recall authorizing three weeks. (ECF No. 55-11, PageID.4846.) And Grant recalls McWilliams saying, "MJ has already approached me about

providing a cover for the whole Mike Musto and vacation addendum." (ECF No. 55-25, PageID.5621.) As for the altered performance review, it is true that Cannon did not know for certain that Dickson had changed it. But he says that Brian Buck had led him to believe that Dickson was the person responsible. (*See* ECF No. 55-11, PageID.4845.) And Grant similarly says, "[Buck] brought it to my attention that . . . the [real-estate] manager was furious that Mary Jane changed [the review]." (ECF No. 55-25, PageID.5585–5586.) As for late target income analyses, Dickson implies that she was not responsible. (ECF No. 57, PageID.5749.) But when Dickson responded to Grant's email about the late analyses, she appeared to accept some responsibility: "They just need [account executive] signatures. You will have them by [close of business] Thursday." (ECF No. 60-4, PageID.6218.) In short, it appears that Adams Outdoor had business reasons for removing Dickson from the company.

But under a mixed-motive analysis, that is not the end of the story. "In order to reach a jury, the plaintiff is not required to eliminate or rebut all the possible legitimate motivations of the defendant as long as the plaintiff can demonstrate that an illegitimate discriminatory animus factored into the defendant's decision to take the adverse employment action." *See White v. Baxter Healthcare Corp.*, 533 F.3d 381, 401 (6th Cir. 2008). And here, for at least two reasons, a reasonable jury could find that Dickson's gender factored into Adams Outdoor's decision to remove her from the company.

First, a jury could reasonably link Dickson's swift exit to gender bias.

In September 2015, after Dickson had already been working at Adams Outdoor for about six months, she was made interim general manager. So while Eigenberger apparently had some reservations at the time, he still chose to expand her role. (*See* ECF No. 55-3, PageID.3851.) And

it appears that Dickson continued to hold the interim general manager spot until Cannon started on December 1, 2015.

Yet a mere two months after that, Dickson was out of the company entirely. True, almost all of Cannon's and Grant's issues with Dickson first came to light during those two months. And Cannon, Eigenberger, and Grant each say they talked to or coached Dickson on some of her job-related problems. (ECF No. 55-12, PageID.4957–4958 (Cannon); ECF No. 55-3, PageID.3837, 3843–3845 (Eigenberger); ECF No. 55-25, PageID.5619; ECF No. 55-25, PageID.5633–5634, 5588–5589 (Grant).)

But—and this is key—Adams Outdoor had a formal progressive-discipline or performance-improvement process. (ECF No. 55-3, PageID.3783, 3846; ECF No. 55-25, PageID.5619; ECF No. 55-2, PageID.3500.) And Dickson was never placed on such a plan. (ECF No. 55-12, PageID.4958–4959; ECF No. 55-3, PageID.3846–3847; ECF No. 55-25, PageID.5619, 5665.) So even if Cannon and Grant had only recently learned of Dickson's performance issues, Adams Outdoor does not explain why a progressive-discipline or a performance-improvement plan was not the first step. And Adams Outdoor does not explain why the second step was not demotion or transfer. And given the evidence of the decisionmakers' bias against women (to be discussed in detail in a moment), a reasonable jury could think that Dickson's gender was a significant reason that Adams Outdoor skipped steps.

Second, although Cannon and Grant each articulated performance-related reasons for terminating Dickson, a jury could find that the two men unduly scrutinized Dickson because of gender bias. Cannon, who appears to have been the one who primarily decided to eliminate the general sales manager position, had told Dickson that there were "too many women" in the Ann Arbor office and that they led to "too much drama." And Cannon or Eigenberger (or both) denied

Dickson the position in Indiana because she was a "single mom." So a reasonable jury could find that Cannon was biased against female employees at Adams Outdoor.

And a jury could reach a similar conclusion as to Grant. Sjoberg recalls that Grant "was very touchy, feely with the young women in the office, sitting on their desks in cubicles, hugging, cheek kissing and inviting to drinks." (ECF No. 57-10, PageID.5836.) In Sjoberg's opinion, Grant was "more of an HR issue than a HR person." (ECF No. 55-9, PageID.4653.) And, according to at least Dickson, Grant danced inappropriately with Ashley Love in Mexico. So a reasonable jury could find that Grant did not assess female employees like Dickson in the same way he assessed male employees.

As for Eigenberger (it appears that Eigenberger would have had to authorize any inter-office transfer (*see* ECF No. 57-25, PageID.6127–6128; ECF No. 57-30, PageID.6142)), the Court has already discussed how a reasonable jury could find that he was biased against female employees.

In short, Cannon and Grant have articulated business reasons for eliminating Dickson's position and not offering her any other position within Adams or Fairway. And at least some of those reasons are supported by the evidence. But a reasonable jury could find that Cannon, Grant, and Eigenberger were biased against female employees. And it would be reasonable to think that their gender bias was a factor in Dickson not having a chance to turn around her performance on a progressive-discipline plan in another market. It would also be reasonable to think that their gender bias resulted in heightened scrutiny of Dickson's job performance, which, perhaps, explains some of Cannon's and Grant's issues with Dickson. As such, a reasonable jury could find that a motivating factor in Dickson's complete removal from Adams Outdoor was her gender. *See* 42 U.S.C. § 2000e-2(m).

* * *

Adams Outdoor is not entitled to summary judgment on Dickson's discrimination claims under Title VII. To be specific, a jury rather than this Court must decide whether Adams Outdoor (1) did not promote Dickson to be the general manager of Ann Arbor, (2) denied her the interim general manager position in Indiana, or (3) completely eliminated her from Adams Outdoor and Fairway Outdoor on the basis of gender in violation of 42 U.S.C. § 2000e-2(a) or § 2000e-2(m).

### D.

Before turning to Dickson's retaliation claims, the Court briefly addresses Dickson's discrimination claims under Michigan's Elliott-Larsen Civil Rights Act. Although similar, ELCRA and Title VII may have material differences. For instance, while an employee may pursue a mixed-motive claim under ELCRA, ELCRA has no express mixed-motive provision (or accompanying damages-limiting provision). *See Harrison v. Olde Fin. Corp.*, 572 N.W.2d 679, 684 & n.15 (Mich. Ct. App. 1997). But if the law governing ELCRA and Title VII discrimination claims differs, Adams Outdoor does not use those differences to its advantage. (*See* ECF No. 55, PageID.3439.) As such, for the reasons Dickson's discrimination claims under Title VII will proceed to a jury, so too will Dickson's discrimination claims under ELCRA.

### IV.

Dickson also claims that Adams Outdoor retaliated against her in violation of Title VII and ELCRA. More specifically, Dickson says she twice reported gender discrimination and, as a result, Adams Outdoor terminated her employment. The Court starts with Dickson's retaliation claim under Title VII.

**A.**

Adams Outdoor says it is entitled to summary judgment because there is insufficient evidence of causation. (ECF No. 60, PageID.3446–3448.) Title VII prohibits an employer from taking an action adverse to an employee "because" the employee "opposed . . . an unlawful employment practice." *See* 42 U.S.C. § 2000e-3(a). Here, the word "because" means but-for causation. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). Thus, Dickson must ultimately convince a jury that absent her complaints of gender discrimination, she would have stayed with Adams or Fairway. Adams Outdoor says that no reasonable jury could be convinced.

A good way to start the analysis is by identifying the end points of the causal chain: the asserted protected conduct and the asserted adverse action. Here, actually, there are two causal chains. One starts with Dickson's complaint to Buck upon her return from the Mexico trip and ends with her termination about a week later. The other has the same end point, termination, but starts two or three months earlier—when Dickson complained to Buck that she was "passed over" for the general manager position in Ann Arbor because she is a woman. With the end points of the chain established, the task is to determine the strength of the links.

Take first Dickson's retaliation claim based on her complaint to Buck when she returned from the Mexico trip. No reasonable jury could find for Dickson on this claim because the record reflects that Adams Outdoor had largely decided to terminate Dickson *before* Mexico. Cannon says that before Mexico, he recommended to Gleason and Eigenberger that the general sales manager position be eliminated. (ECF No. 55-11, PageID.4839.) Dickson identifies no contrary evidence. Also before Mexico, Grant sent Gleason and Eigenberger his "unsolicited feedback" about Dickson. (ECF No. 57-19, PageID.5999.) In that email, Grant opined that Dickson was "probably not the type and quality of individual we want in any type of leadership capacity whether

it's with AOA or FOA." (*Id.*) Grant recommended "exit[ing] [Dickson] out of the organization as quickly as is practical." (*Id.*) So before any partying in Mexico, and before any complaint about partying, Cannon had recommended eliminating Dickson's position and Grant had recommended "exit[ing]" Dickson from the Adams and Fairway organizations as soon as possible.

True, Gleason and Eigenberger did not decide whether they agreed with Cannon's recommendation until after Mexico. (ECF No. 55-11, PageID.4840, 4872.) Cannon even says that "[i]t became a lot more clear after that trip." (ECF No. 55-11, PageID.4882.)

But Dickson points to no evidence suggesting that Gleason and Eigenberger were leaning the opposite way of Cannon and Grant. Indeed, both Gleason and Eigenberger say that the decision of who to eliminate (Musto or Dickson) rested with Cannon. (ECF No. 55-2, PageID.3666; ECF No. 55-3, PageID.3909, 3918; *see also* ECF No. 55-24, PageID.5508.) Stated differently, for Dickson's complaint about Grant to be a but-for cause of her termination, there would have to be some evidence that if Dickson had not complained about Grant's behavior in Mexico, Cannon and Grant were going to change their recommendations or Gleason and Eigenberger were not going to accept their recommendations. Dickson points to no such evidence.

Now consider Dickson's complaint to Buck that she was "passed over" for the general manager job "because I'm a woman." The timing of this retaliation claim is better for Dickson. Although it is not clear when Dickson complained to Buck that she was passed over, it was apparently soon after Cannon's hire. That places her complaint in November or December 2015. Cannon's position-elimination recommendation was not until late January or early February 2016 and Grant's "unsolicited feedback" email was sent in early February 2016. So unlike the complaint about Grant's behavior in Mexico, Dickson's complaint about being passed over precedes any recommendation to terminate her employment.

Even so, no reasonable jury could find that but for her complaint about not getting the general-manager position, Dickson would have kept a job with Adams or Fairway.

To start, it is clear that Dickson's complaint about being passed over was not the sole reason she was let go. It is not genuinely disputed that the general sales manager position was eliminated in part because there were too many managers in Ann Arbor. Further, as discussed, Grant and Cannon provided business reasons for terminating Dickson that have support in the record. And Dickson says that her gender was at least a motivating factor in her termination. So, at most, Dickson's complaint to Buck was one among several reasons for her termination.

Second, a reasonable jury would question the considerable delay between Dickson's complaint and Cannon's and Grant's recommendations to terminate Dickson's employment. As noted, Dickson complained to Buck about being passed over for the general manager position in November or December 2015. Yet, weeks later, no one had decided that Dickson would be out of the company. On January 22, 2016, Grant emailed Cannon: "Determine who is needed in your group, MJ or Mike [Musto] and lay the other off. If it's Mike [Musto], you'll need to address the issue of [Dickson's] job title since you don't need a GSM in AA with a fulltime GM." (ECF No. 55-18, PageID.5311.) Eigenberger chimed in: "Agree on all accounts . . . sooner the better." (*Id.*) If Dickson's complaint about being passed over truly irked Cannon, Grant, or Eigenberger to the point of retaliation, why, weeks after her complaint, was Cannon still contemplating keeping Dickson? And why, weeks after her complaint, were Grant and Eigenberger still open to the possibility that Musto would be the one to go? A reasonable jury would want answers to those questions; Dickson has not supplied them.

Third, and what most undermines Dickson's retaliation claim based on her "passed over" complaint, is the lack of evidence that Cannon, Grant, or Eigenberger knew that Dickson's complaint was related to her gender.

True, there is evidence that Cannon, Grant, and Eigenberger were aware that Dickson had complained about not getting the Ann Arbor general manager position. Grant says he learned from Buck that Dickson "was upset that Mike Cannon got hired over her." (ECF No. 55-25, PageID.5602.) At the time, Grant even thought that Dickson was "trying to convince the employees that she's the best person" for the general manager position and was "creating cliques and building alliances." (ECF No. 55-25, PageID.5643; ECF No. 57-5, PageID.5999.) So Grant knew Dickson was unhappy that Cannon got the job. As for Cannon, he remembers Dickson telling him that she felt "slighted" that she did not get the general manager position. (ECF No. 55-11, PageID.4857.) Further, both Cannon and Grant were under the impression that Dickson had sued her former employer (which, in fact, is not true). (ECF No. 55-12, PageID.4972; ECF No. 55-24, PageID.5550.) As for Eigenberger, he presumably would have known that Dickson was upset she did not get the job because he was the one who decided to hire Cannon and the one who told Dickson that she had not been selected. (ECF No. 55-7, PageID.4312.)

But knowing that an employee complained about not getting a job is not the same as knowing that an employee complained about not getting a job because of an unlawful employment practice, like sex discrimination. Title VII does not prohibit retaliation for the former, only the latter.

And, here, the evidence does not suggest that Gleason, Eigenberger, Grant, or Cannon knew that Dickson had complained of being passed over because of her gender. Grant says he never heard that Dickson had complained of being passed over for a less-qualified male or, at least,

41

he has no recall of any such complaint. (*Compare* ECF No. 55-24, PageID.5479; ECF No. 57-15, PageID.5928, *with* ECF No. 55-25, PageID.5602; ECF No. 57-15, PageID.5929, 5970.) Eigenberger likewise says he "never heard" that Dickson complained that she was passed over in favor of a less-qualified male. (ECF No. 55-3, PageID.3880.) Same with Cannon. (ECF No. 55-11, PageID.4857–4858, 4862–4863; ECF No. 55-13, PageID.5020–5021, 5104, 5106.) And Gleason. (ECF No. 55-2, PageID.3576.) Buck, who received Dickson's complaint, and thus would have been the person to convey it, believes that Dickson did not reference discrimination (gender or otherwise). (ECF No. 55-10, PageID.4744–4745.) So the record reflects that none of the people involved in Dickson's removal from Adams Outdoor knew that Dickson had complained that she was passed over because of her gender. As such, no reasonable jury could find that had Dickson not reported to Buck that she was denied the general manager position because she is a woman, Dickson would have kept a job at Adams or Fairway.

So Adams Outdoor is entitled to summary judgment on Dickson's claims of retaliation pursuant to Title VII.

## B.

The Court thus turns to Dickson's retaliation claims under Michigan's Elliott-Larsen Civil Rights Act.

The causal standard for retaliation claims under ELCRA might be different than under Title VII. *See Newton v. Mariners Inn*, No. 332498, 2017 WL 5759949, at *10 (Mich. Ct. App. Nov. 28, 2017) (providing that, under ELCRA, protected conduct must be a "significant factor" in the decision to take adverse action); *but see Beard v. AAA of Michigan*, 593 F. App'x 447, 452 (6th Cir. 2014) (explaining that ELCRA and Title VII both require but-for causation). But Dickson makes no attempt to reconcile the conflicting law in her favor. (*See* ECF No. 57, PageID.5750–

5757.) Nor does Dickson argue why a "significant factor" standard would result in a different outcome on the facts of this case. (*See id.*)

So for the reasons that the Court will grant Adams Outdoor's summary judgment on Dickson's claim of retaliation under Title VII, the Court will grant Adams Outdoor's summary judgment on Dickson's claim of retaliation under ELCRA.

## V.

For the reasons given, the Court GRANTS IN PART and DENIES IN PART Adams Outdoor's motion for summary judgment (ECF No. 55). In particular, Dickson's claims that Adams Outdoor violated Title VII's and ELCRA's prohibition on gender discrimination when it did not promote her to general manager of the Ann Arbor market, when it did not consider her for the interim general manager position in Indiana, and when it eliminated her from the Adams and Fairway organizations will proceed to a jury. But Dickson's retaliation claims under Title VII and ELCRA are DISMISSED.

SO ORDERED.

Dated:  January 6, 2020


                                   s/Laurie J. Michelson
                                   LAURIE J. MICHELSON
                                   UNITED STATES DISTRICT JUDGE